**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAVID PAUL DECHAMPLAIN, | : | Civil No.  1:24-CV-845 |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | (Magistrate Judge Carlson) |
| Commissioner of Social Security | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

## I.    Introduction

This Social Security appeal illustrates the importance of articulation in the decision of an Administrative Law Judge (ALJ) when assigning persuasive value to medical opinion evidence. Case law has long placed a duty of articulation upon ALJs when deciding Social Security disability claims. Thus, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected

1

and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

These principles apply equally to our review of an ALJ's consideration of the medical opinion evidence. On this score, under the new paradigm which governs the analysis of medical source opinions, the Commissioner has eschewed the treating physician rule, which created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy, in favor of a more holistic approach which examines all medical opinions in terms of their overall consistency and supportability. Under this new paradigm, "the ALJ must . . . articulate how [he or she] considered the medical opinions and how persuasive [he or she] find[s] all of the medical opinions," focusing on the consistency and supportability of each opinion. Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (internal citations omitted). While it is ultimately the province and duty of the ALJ to choose which medical opinions and evidence deserve greater weight, the decision must be accompanied by an adequate, articulated rationale weighing these factors.

The instant appeal aptly illustrates the interplay of these paradigms in our consideration of whether substantial evidence supports the decision of the ALJ denying the plaintiff's disability claim. The plaintiff in this case, David

Dechamplain, is a younger individual who suffers from severe psychological impairments which clearly affect his ability to perform work-related activity. Specifically, the plaintiff struggles with severe depression and anxiety which every treating source concluded would render him unable to sustain full-time employment. A consultative examiner also concluded the plaintiff would have significant limitations in his ability to perform the interpersonal requirements of full-time work. Thus, every medical source that actually interacted with Dechamplain concluded he would be disabled, a fact which triggers a significant obligation upon ALJs to articulate why an apparent treating source consensus should not be adopted. See Fallin v. Bisignano, No. 4:24-CV-180, 2025 WL 1749654, at *1 (M.D. Pa. June 24, 2025); Kenyon v. Kijakazi, No. 1:22-CV-1457, 2023 WL 5617791, at *13 (M.D. Pa. Aug. 30, 2023); Bentler v. Kijakazi, No. 1:21-CV-913, 2022 WL 3362536, at *11 (M.D. Pa. Aug. 15, 2022).

Despite this heightened obligation on the part of the ALJ to explain why this treating source consensus was rejected, specifically addressing the consistency and supportability of each opinion, here, the ALJ found every treating and examining source unpersuasive and instead adopted the moderate limitations opined by the only source who did not examine or treat the plaintiff and did not adequately address why the treating source consensus was rejected despite these opinions' consistency with

3

one another. Moreover, the ALJ mischaracterized the treatment records in a way which undercuts the supportability of this treating source consensus. For example, the ALJ rejected these treating source opinions as inconsistent with the plaintiff's conservative mental health treatment during the relevant period, ignoring records just prior to the relevant period showing the plaintiff underwent twelve treatments of electroconvulsive therapy for his depression – a treatment which, in our view, is anything but conservative.

This medical opinion evidence analysis by the ALJ falls short of meeting the heightened obligation of articulation when an ALJ is faced with a treating source consensus endorsing a plaintiff's disability. Therefore, for the reasons set forth below, we will remand this case for further consideration by the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

On July 19, 2017, David Dechamplain applied for a period of disability and disability insurance benefits under Title II and protectively filed a Title XVI application for supplemental security benefits. (Tr. 17). In both applications, the plaintiff alleged that he was totally disabled as of March 28, 2017,[1] due to severe

---

[1] The plaintiff previously filed for disability and disability insurance benefits on December 1, 2014, and his application was denied after an ALJ issued an unfavorable decision on March 27, 2017. (Tr. 63-84). Thus, the date of onset of his disability is the day following the issuance of this unfavorable decision.

4

depression, severe anxiety, inability to concentrate, type I diabetes, and extreme fatigue. (Tr. 91). Dechamplain was born on March 1, 1976, and was 41 years old at the time of the alleged onset of his disability, which is defined as a younger individual under the Commissioner's regulations. (Tr. 90).

In connection with this disability application, on August 13, 2017, Dechamplain submitted an adult function report which carefully detailed the nature of his emotional disability. (Tr. 244-251). This report acknowledged that Dechamplain had the ability to perform some tasks of daily living, including personal care, caring for some pets with help, preparing simple meals, and doing some chores, but explained that the plaintiff suffered from profound, and often paralyzing anxiety and depression that rendered him unable to engage in sustained employment or meet the emotional demands of the workplace on an ongoing basis. (Id.) Thus, these reports clearly focused upon Dechamplain's episodes of depression and anxiety as the root causes of his claimed disability. With Dechamplain's claim defined in this fashion, the clinical record provided support for his assertion that he was significantly impaired due to these mental health conditions.

A.    **Dechamplain's Clinical History of Depression and Anxiety**

The emotional impairments claimed by the plaintiff were well documented in Dechamplain's clinical treatment records. Taken as a whole, as in many cases

5

involving mental illness, there was a dichotomy to these treatment notes and records. While Dechamplain's lengthy treatment history acknowledged that he was fully oriented and often displayed a normal affect, those records also routinely documented that his depression and anxiety were severe.[2] With respect to his depression and anxiety, the immediate disabling concerns cited by the plaintiff, Dechamplain's treatment history highlighted the cyclical nature of mental illnesses like depression, with notes documenting good and bad days.[3] Nonetheless, overall, his depression was characterized as "severe" and his treatment history was marked by frequent episodes of crying, depression, panic attacks, and passive suicidal thoughts. (Tr. 357-58, 440, 547, 559, 561, 632, 637-660, 693-95, 791, 879). Moreover, the record demonstrates that he sought increasingly more significant treatment for his depression and anxiety, including a series of twelve electroconvulsive therapy (ECT) treatments just prior to the relevant period. (Tr. 47, 320).[4]

---

[2] See e.g., Tr. 357-58, 368, 547-50, 557, 562-63, 632-35, 613-16, 637-60, 693-95, 810, 830.

[3] In July 2017, the plaintiff noted that one out of four days are "bad," and the rest are so-so. (Tr. 358).

[4] In August 2017, his primary care provider stated, "the patient failed medication and [electroconvulsive therapy] treatment" for depression. (Tr. 322).

The record also reflects that the plaintiff experienced significant social anxiety and experienced panic attacks and violent outbursts during periods of stress or increased activity. The consultative examiner explained he had "phobic responses to crowds, enclosed spaces, and new situations; panic attack symptoms of trembling, chest pressure . . . usually one to two times per week triggered by new situations and things that are out of the ordinary." (Tr. 548). The plaintiff experienced relief from his violent outbursts with the medication sertraline (Zoloft), (tr. 758), though he still reported three to four per year. (Tr. 791). Remarkably, the plaintiff reported that sertraline gave him tremors from "serotonin syndrome" but that he "did not mind the tremors as much as the control of his depression," (tr. 329), demonstrating both the severity of the plaintiff's symptoms as well as his commitment to finding an effective treatment.

Dechamplain's thoroughly documented history of anxiety and depression was also noteworthy in one other respect. Treatment notes frequently acknowledged that his depression and anxiety interfered with his ability to meet the mental demands of the workplace. (Tr. 319, "Panic interferes with ongoing work;" Tr. 367, "I miss work some, but have had a breakdown whenever have tried to work;" Tr. 547, Explaining he quit his job in 2014 because of depression and anxiety; Tr. 319, "If he volunteers more than 10 hours per week he is exhausted").

The record demonstrates that the symptoms of Dechamplain's depression and anxiety were both severe and longstanding; he described having symptoms of anxiety and depression as early as his teenage years and severe social anxiety starting in childhood. (Tr. 754). Indeed, prior to the alleged onset date, the plaintiff underwent involuntary psychiatric hospitalizations in 2003, 2005, and 2015 for verbal and physical outbursts and suicidal thoughts. (Tr. 320, 754-55). In 2003 he was diagnosed with depression following his psychiatric hospitalization and began medication treatment. (Tr. 754-55). He had seen various mental health providers in the period following. (Tr. 320).

After resigning from his job in 2015, he attempted to purchase a gun but was ineligible because a background check reported his history of hospitalization. (Tr. 754-55). Instead, he attempted suicide by cutting his wrists but "quit the attempt." (Tr. 319). He was hospitalized again in 2015 for depression and suicidal thoughts. (Tr. 754-55). The plaintiff also underwent twelve treatments of electroconvulsive therapy in 2015. (Tr. 493, 500). At the hearing the plaintiff described this treatment as "a last-ditch attempt to hopefully relief me of my anxiety." (Tr. 47). The treatment records show the plaintiff "experienced no benefit" from the ECT treatments, (tr. 754-55), and that he continued to struggle with depression, (tr. 500-01), but that the

8

therapy left him with confusion, difficulty focusing, and memory loss. (Tr. 47, 54, 329-30).

By 2016, Dechamplain's primary care physician explained that the plaintiff's severe depression was "under decent control, but with multiple antidepressants." (Tr. 330). It was noted that he was "coping," but still experienced panic attacks and that his symptoms would swing up and down depending on stress and his life situation. (Tr. 319). During the period following his alleged onset date in 2017, the plaintiff was being treated by psychiatrist Dr. Lee Miller whose treatment notes, and the notes of the plaintiff's primary care provider Dr. Poole, frequently reflected variable mood, crying spells, and worsening depression throughout 2017. (Tr. 357-58, 368, 440, 557, 560-61, 751). Dechamplain also described extreme fatigue, requiring a midday nap, and difficulty concentrating, for which he was prescribed Ritalin. (Tr. 357, 368, 559, 562-63). In August 2017, his primary care provider stated that "he also has severe depression which just recently failed electroconvulsive therapy and his psychiatrist now has him on permanent disability," noting, "the patient failed medication and ECT treatment" for depression. (Tr. 322).

In September 2017, the plaintiff was examined by consultative examiner Dr. Christopher Gipe. The mental status examination performed by Dr. Gipe was unremarkable in some respects, revealing fluent speech, coherent and goal directed

9

thought process, full range affect and appropriate speech and thought content, clear sensorium, full orientation, intact attention and concentration, intact memory, average intellectual functioning, and good insight and judgment but also noted nervous and anxious mood. (Tr. 550). Nonetheless, Dr. Gipe noted that Dechamplain experienced significant symptoms from his depression and anxiety, including "extreme fatigue, anxiety, crying episodes, and lack of concentration." (Tr. 547). He also described social withdrawal, difficulty concentrating, excessive worry, and phobic responses to crowds, enclosed spaces, and new situations with panic attacks one to two times per week triggered by new situations and things that are out of the ordinary. (Tr. 548). The plaintiff also described "horrible" short term memory to the consultative examiner. (Id.) According to Dr. Gipe, the plaintiff's prognosis was fair to guarded given the severity of his symptoms. (Tr. 549).

By the end of 2017, the plaintiff's primary care physician noted "worsening depression" and both Dr. Poole and Dr. Miller reported crying spells. (Tr. 560-61, 743-44, 751). Dr. Miller also noted that the plaintiff experienced difficulty concentrating, particularly when reading. (Tr. 560-61). The plaintiff was treating his depression with numerous medications, including Geodon, Lamictal, clonazepam, sertraline, and trazodone for sleep. (Tr. 743).

In February 2018, Dechamplain established care with CRNP Greany-Hudson after Dr. Miller retired. At an initial evaluation, CRNP Greany-Hudson described the plaintiff as isolated, withdrawn, tearful, moody, with concentration problems, low energy, irritability, anxiety, and insomnia. (Tr. 755). He reported passive death wishes but no plan since 2015 when he thought of buying a gun and tried to cut his wrist. (Tr. 755). He was diagnosed with depression, major, severe recurrence, social anxiety disorder, high risk medication use, and obsessive-compulsive disorder. (Tr. 764). Throughout 2018, his mental status examinations were overall unremarkable, but CRNP Greany-Hudson described periods of stability and periods of irritability, tearfulness, and self-isolation. (Tr. 810, 826, 830, 613, 632, 635, 642). Behavioral health notes through 2018 state that Dechamplain struggled with focus and could get overwhelmed with too many activities, experienced irritability and crying and avoided people, had trouble concentrating and low motivation due to his impairments. (Id.) He also frequently reported passive suicidal thoughts including that he is better off dead or thought it would be ok if he did not wake up. (Tr. 614, 792, 893, 879). In October 2018 he reported two episodes of passive death wishes in the prior month as well as symptoms of annoyance and irritability, increase in crying, and that he continued to avoid people and isolate. (Tr. 791-92). In December 2018, Dechamplain reported feeling more down, anxious, and angry, irritable, and

11

on the verge of tears. (Tr. 879). He continued to struggle with maintaining focus and it was noted that he could get overwhelmed with too many activities and felt exhausted and on edge. (Id.) Nonetheless, his mental status examination was again unremarkable. (Tr. 882).

It was against this clinical backdrop, which documented the severity of Dechamplain's anxiety and depression, as well as its impact upon his ability to meet the mental demands of the workplace, that the plaintiff's treating sources opined on the disabling effects of his emotional impairments.

B.    **Medical Opinion Evidence**

Based upon their clinical experience with the plaintiff, three treating sources provided medical statements assessing Dechamplain's ability to perform work on a sustained basis given the emotional impairments that he experienced. All three of these treating sources found that Dechamplain's emotional impairments were disabling.

For example, on October 9, 2018, Dechamplain's former treating psychiatrist, Dr. Lee Miller, completed a mental residual functional capacity (RFC) medical source statement describing his opinion of the plaintiff's ability to perform work-related activity. He explained that he had treated the plaintiff every three to six weeks from April 2011 until the doctor's retirement at the end of 2017. (Tr. 782). Dr. Miller

12

described Dechamplain's prognosis as fair citing to his diagnoses for generalized anxiety disorder with panic, major depressive disorder, avoidant personality disorder, unstable diabetes mellitus and hypertension, and medical instability. (Id.) According to Dr. Miller, who had treated the plaintiff for six years, Dechamplain would be precluded from understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods of time, and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods more than 15% of the workday. (Tr. 783-85). Dr. Miller also opined that the plaintiff would be precluded from understanding, remembering, and carrying out simple instructions, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, making simple work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in the work setting, traveling to unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others 10% of the workday. (Id.) Most significantly, Dr. Miller concluded that Dechamplain's absenteeism would be disabling – opining that the plaintiff would be "off task" more than 30% of an 8-hour workday, would be absent from work five or

13

more days per month, and would be less than 50% as efficient as an average worker on a sustained basis. (Id.)

DeChamplain's new treating psychiatric provider, CRNP Greany-Hudson, who he had been seeing since early 2018 after Dr. Miller's retirement, similarly opined that the plaintiff would be precluded from competitive work due to absenteeism. Indeed, CRNP Greany-Hudson also opined that, based upon her treatment of the plaintiff, he would be absent from work five or more days per month and unable to complete an 8-hour work day five or more days per month. (Tr. 787-90). CRNP Greany-Hudson did not opine on any other of the plaintiff's abilities.

A third treating source, LPC Michelle Braceras, also opined on Dechamplain's mental RFC and concluded he would be unable to sustain consistent employment. LPC Braceras explained she had been treating Dechamplain every two to four weeks since August of 2016 and described his prognosis as "poor; despite treatment, continues to suffer." (Tr. 798). LPC Braceras' opinion was consistent with the other treating sources that the plaintiff would be off-task more than 30% of a workday and absent from work five or more days per month. (Tr. 800). Like Dr. Miller, she also opined that Dechamplain would be less than 50% as efficient as an average worker on a sustained basis, explaining that he experiences extreme lack of focus and inability to concentrate even with preferred tasks. (Tr. 801). LPC Braceras

14

also opined that Dechamplain would be precluded from performing an array of abilities more than 15% of an 8-hour workday, including remembering locations and work-like procedures, understanding and remembering detailed instructions, maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance, and being punctual and within customary tolerances, completing a normal workday and workweek without interruptions from his symptoms, and responding appropriately to changes in the work setting. (Tr. 798-800).

The plaintiff's treating counselor, LPC Braceras, provided a detailed narrative explanation for her opinion, stating that Dechamplain has struggled sustaining a job for most of his adult life, has difficulty functioning, and has frequent anxiety attacks and breakdowns when expectations are placed on him or if things in his daily routine change. (Tr. 801). She stated that he is unable to volunteer more than ten hours per week before his mental capacities begin to deteriorate, he becomes lethargic, excessively anxious, and has difficulty completing routine tasks. (Tr. 802). She also highlighted that he sometimes has passive thoughts of suicide and needs a daily nap in order to function, and that his anxiety leads to occasional emotional outbursts of crying. (Id.) Thus, LPC Braceras' opinion was well explained in terms of why she

15

believed his psychiatric symptoms would cause him to be absent and off-task in excess of allowable standards for employment.

In sum, Dechamplain's three treating sources each reported in a highly consistent fashion that the plaintiff suffered from emotional impairments which were disabling in the workplace. Moreover, these medical opinions often drew direct support from clinical records documenting the severity of Dechamplain's impairments. Taken together, these three treating source opinions described a man who, despite consistent and ongoing efforts to treat his depression and anxiety, was unable to meet the demands of the workplace.

In addition to the treating source consensus that the plaintiff's depression and anxiety were work-preclusive, another examining source, consultative examiner Christopher Gipe, completed a mental RFC assessment of the plaintiff after examining him. While Gipe did not opine on the plaintiff's absenteeism, he concluded that the plaintiff would have marked limitations in interacting appropriately with the public, supervisors, and coworkers and, like the other treating sources, would have marked limitations in responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 553).

In stark contrast to this treating and examining source consensus that the plaintiff's depression and anxiety significantly limited his ability to function in the

16

workplace was the view of the non-examining state agency expert, Dr. Chiampi, who opined in September of 2017 that Dechamplain was only moderately limited in functioning and maintained the capacity to carry out basic routine tasks, stating "his current mental status appears stabilized with intact concentration and memory functions." (Tr. 95). This opinion was both inconsistent with every other opinion of record and internally inconsistent. First, the opinion was an outlier in its characterization of the severity of the symptoms experienced by the plaintiff, for example, in concluding his social interaction capacities were "adequate for basic social interactions" despite every other opinion stating he had significant or marked limitations in this arena. (Tr. 101). But, even more significantly, the opinion was internally inconsistent in that, in the worksheet portion of the assessment which explains the limitations in "paragraph B" criteria for workplace functioning, Dr. Chiampi indicated that Dechamplain would be moderately limited in his ability to understand, remember, or apply information, (tr. 95), yet in the RFC portion of the opinion, Dr. Chiampi stated the plaintiff had no understanding and memory limitations. (Tr. 100).

C.    **The ALJ Decision**

A disability hearing was conducted in Dechamplain's case on November 29, 2018, at which Dechamplain, his mother, Justina Dechamplain, and a vocational

17

expert testified. (Tr. 33-62). At the hearing, the plaintiff testified that he gets extremely weepy, has suicidal ideations, and that his severe anxiety causes him to be unable to interact with people. (Tr. 39). He stated that, since being on Zoloft (sertraline) he has been able to control violent outbursts but that it does not control his other symptoms of depression. (Tr. 40). He testified that demands for social interaction, staying on schedule, and increased responsibilities cause panic attacks, (tr. 41-42), and that since receiving 12 treatments of ECT in a "last-ditch attempt to hopefully relieve me of my anxiety" his ability to focus and read has gone away. (Tr. 47). Overall, the plaintiff testified that being on a schedule and interacting with others takes an immense amount of mental and physical energy for him, there are days he simply cannot function, and when he is the most active is when he has the majority of panic attacks. (Tr. 48-49).

The plaintiff's mother also testified that Dechamplain struggles with change in his routine and violent outbursts. She stated he is triggered by little changes, though is much better on his medications. His mother stated he has passive suicidal talk, was hospitalized twice and attempted to cut his wrists the last day he worked. (Tr. 53). She reinforced that the ECT did not work on him, and the only effects were that it damaged his short-term memory. (Tr. 54).

18

A vocational expert also testified at the hearing that if the plaintiff were unable to complete an eight-hour workday five days or more per month or could not perform on a sustained basis 50% of the time over a 12 month period he would be unemployable. (Tr. 61). The VE also testified that if he were incapable of performing a routine, repetitive task on a sustained basis or was incapable of interacting appropriately with coworkers and supervisors on a sustained basis he would be unemployable. (Id.)

Following this hearing, on April 29, 2019, the ALJ issued a decision in Dechamplain's case. (Tr. 14-28). In that decision, the ALJ first concluded that Dechamplain last met the insured status requirements of the Act on March 31, 2019, and had not engaged in substantial gainful activity since his alleged onset date of March 28, 2017. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Dechamplain had the following severe impairments: diabetes mellitus, major depression, and anxiety disorder. (Id.)

At Step 3, the ALJ determined that Dechamplain did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 20-21). At this step, the ALJ also considered whether the "paragraph B" criteria were satisfied in determining whether the severity of his mental impairments met the criteria of any listing and concluded Dechamplain

19

had a moderate limitation in understanding, remembering or applying information, interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself. (Id.)

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Dechamplain impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and he can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. He can never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to cold temperature extremes. He should avoid unprotected heights or machinery. He has the mental capacity for routine repetitive tasks, occasional changes in the work setting, no piece rate work, occasional interaction with supervisors and coworkers, and no interaction with the public.

(Tr. 21).

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Dechamplain's self-described limitations. The ALJ first engaged in a two-step process to evaluate Dechamplain's alleged symptoms, finding that, although the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 22).

In making this determination, the ALJ considered Dechamplain's statements and testimony regarding his impairments and limitations and concluded they were inconsistent with the longitudinal medical record which showed normal clinical findings on examination. Yet, the ALJ's summary of the longitudinal record focused on treatment notes of normal mental status examinations, including full orientation, coherent and goal directed thought processes, but failed to acknowledge the treatment notes stating worsening depression, difficulty concentrating, extreme fatigue, panic attacks, and social anxiety during the relevant period.

The ALJ then considered the medical opinion evidence, the analysis of which forms the basis of this appeal. The ALJ first addressed the opinion of Dechamplain's treating psychiatrist, Dr. Miller, and concluded this opinion was unpersuasive because it was unsupported by his treatment notes "which shows the claimant is about the same and the claimant helped his cousin's wife study." (Tr. 24). The ALJ also found the opinion was unsupported because it was a checklist with limited explanation. (Id.) Finally, the ALJ concluded Dr. Miller's opinion was inconsistent with Dechamplain's activities of daily living and inconsistent with the lack of inpatient mental health treatment following the alleged onset date and the psychiatric treatment record "of a conservative nature" since the alleged onset date.

21

The ALJ similarly rejected the opinions of treating sources LPC Braceras and CRNP Greany-Hudson. As to LPC Braceras, the ALJ concluded her opinion was inconsistent with the normal mental status examination findings. (Tr. 25). The ALJ then rejected the opinion of CRNP Greany-Hudson as unsupported "because it is a checklist with minimal explanation," and as inconsistent with Dechamplain's "lack of inpatient mental health treatment." (Tr. 26).

The ALJ also found the opinion of consultative examiner Dr. Gipe unpersuasive for the same reasons – finding it inconsistent with his mental status examination results showing full orientation, goal directed thought processes, and good insight and judgment and the lack of inpatient mental health treatment since the alleged onset date.

The rejection of this treating and examining source consensus was remarkable in that it neither addressed the striking consistency of the opinions of these providers who had regularly seen and treated the plaintiff that his depression and anxiety were entirely disabling nor addressed treatment notes frequently showing episodes of crying, depression, panic attacks, and passive suicidal thoughts, which tended to support these treating source opinions. Moreover, the ALJ's characterization of the plaintiff's treatment as "conservative," and focus on a "lack of inpatient mental health treatment" vastly underplays the overall picture of the plaintiff's treatment

22

which included at least three inpatient hospitalizations, a suicide attempt just two years prior to the alleged onset date, a series of a dozen electroconvulsive therapy sessions which occurred the year prior, and the fact that the plaintiff was being treated with at least four psychiatric medications, one of which he took despite it causing tremors because he "did not mind the tremors as much as the control of his depression," (Tr. 329).

In rejecting the treating source consensus that the plaintiff was disabled by his depression and anxiety, the ALJ adopted the opinion of the non-treating, non-examining State agency psychological consultant who had concluded the plaintiff was moderately limited in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself. The ALJ also accepted this expert's opinion that the plaintiff was moderately limited in understanding, remembering, or applying information, despite the opinion also stating at a different point that he had no limitations in this arena. The ALJ accepted this opinion as consistent with the normal mental status examination findings and the lack of inpatient mental health treatment during the alleged onset date and credited Dr. Chiampi as a "highly qualified expert who had the opportunity to review the claimant's records." (Tr. 25). The ALJ did not address the internal inconsistency in this opinion—which opined that the plaintiff was both moderately impaired and

23

totally unimpaired—or the fact that it was an outlier opinion compared to all the other mental health opinion evidence.

Having made these findings, the ALJ concluded that Dechamplain could not perform his past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 26-28). Therefore, the ALJ found that Dechamplain had not met the exacting standard for disability prescribed by law and denied this claim. (Id.)

This appeal followed. On appeal, the plaintiff challenges the ALJ's consideration of the medical opinion evidence, arguing that the ALJ erred in rejecting the treating source consensus that the plaintiff is disabled by his mental impairments. Upon careful consideration of the entire record we conclude that the ALJ has not provided sufficient justification for rejecting every treating source opinion, which draw substantial support from the clinical record. Therefore, we will remand this case for further proceedings by the Commissioner.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

24

findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

25

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

26

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

27

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be

29

set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

30

opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In

31

this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d

32

Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.      **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed his disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court has aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer

33

give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the

34

persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);

35

Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
"SSR 96–2p does not prohibit the ALJ from crediting some parts of a
treating source's opinion and rejecting other portions"); Connors v.
Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
10, 2011). It follows that an ALJ can give partial credit to all medical
opinions and can formulate an RFC based on different parts from the
different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

It is against these legal benchmarks that we assess the instant appeal.

### D.    This Case Will Be Remanded for Further Consideration of the Medical Opinion Evidence.

This case presents a circumstance which we have confronted in the past

where, in formulating the plaintiff's RFC, the ALJ has rejected a treating source

consensus that the plaintiff is unable to meet the demands of the workplace in favor

of a non-treating, non-examining source concluding he has only moderate

impairments in functioning. At the outset, we acknowledge there is no categorical

rule requiring an ALJ to accept and adopt a consensus of treating source medical

opinions. Indeed, in the past we have affirmed cases where an ALJ's decision to find

every treating source opinion unpersuasive was supported by substantial evidence.

See e.g. Cortese v. Bisignano, No. 4:24-CV-1830, 2026 WL 1123499, at *2 (M.D.

Pa. Jan. 27, 2026), report and recommendation adopted, No. 4:24-CV-01830, 2026

WL 580170 (M.D. Pa. Mar. 2, 2026). Nonetheless, as we have noted, the rejection

36

of a treating source consensus triggers a significant obligation upon an ALJ to articulate why it should not be adopted. See Fallin v. Bisignano, No. 4:24-CV-180, 2025 WL 1749654, at *1 (M.D. Pa. June 24, 2025); Kenyon v. Kijakazi, No. 1:22-CV-1457, 2023 WL 5617791, at *13 (M.D. Pa. Aug. 30, 2023); Bentler v. Kijakazi, No. 1:21-CV-913, 2022 WL 3362536, at *11 (M.D. Pa. Aug. 15, 2022).

Here, the ALJ has rejected a treating source consensus from three different medical sources who had cared for Dechamplain over a span of years, and a psychological consultant who examined the plaintiff. Each of these sources found the plaintiff's emotional impairments to be disabling. Moreover, these treating and examining sources often drew upon contemporaneous treatment notes which thoroughly documented the severity of Dechamplain's depression and anxiety and the ways in which it undermined his ability to meet the emotional demands of the workplace. Thus, it was clear that every medical professional who interacted with the plaintiff knew he would be unable to sustain full-time employment in the capacity articulated by the ALJ.

In our view, the ALJ's justification for this course of action—which consisted of the rejection of every treating and examining source medical opinion—cannot be justified based upon the explanation provided by the ALJ that these opinions were inconsistent with mental status examinations, which are a snapshot and often do not

tell the whole story of a plaintiff's ability to function in the workplace,[5] unsupported as checkbox opinions, and inconsistent with the plaintiff's lack of inpatient hospitalization following the alleged onset date. Indeed, this rationalization by the ALJ is flawed in several ways.

First, the ALJ's decision cannot be reconciled with the revised medical opinion regulations that the ALJ was obliged to follow. Those regulations eschew any hierarchical ranking of opinions, but call upon ALJ's to evaluate medical opinions against the following benchmarks:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

---

[5] See e.g. Cintron v. Comm'r of Soc. Sec., No. 6:17-CV-06017(MAT), 2018 WL 507156, at *5 (W.D.N.Y. Jan. 23, 2018) (quoting Program Operations Manual System ("POMS") DI 22511-005-D) ("The Commissioner . . . has cautioned that observing ability to concentrate in the context of a mental status examination done during an office visit is not necessarily indicative of ability to concentrate in a work or work-like setting, and that "[g]reat care should be exercised in making assumptions about the inability to sustain attention or pace under the stress of competitive employment for a normal workday or workweek based on short term mental status or psychological testing by a clinician.")

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c.

In this case, a dispassionate assessment of the treating source consensus that Dechamplain was totally disabled against these regulatory criteria continues to cast grave doubt upon the sufficiency of the ALJ's medical opinion analysis. Indeed, in our view, all of the factors relating to Dechamplain's relationship with these medical

39

sources favored recognizing the persuasive power of these opinions. Thus, Dechamplain had a longstanding, first-hand treatment relationship with these caregivers that involved repeated contacts over several years. Therefore, the treating sources had a uniquely valuable longitudinal perspective on Dechamplain's mental state, a fact which the ALJ failed to sufficiently assess in his analysis.

Further, given that "supportability . . . and consistency . . . are the most important factors [to] consider when [] determine[ing] how persuasive [to] find a medical source's medical opinions . . . to be," 20 C.F.R. § 404.1520c(b)(2), we find that the ALJ's evaluation of these treating source opinions failed to adequately address several critical factors. First, taken together, the opinions of Dr. Miller, CRNP Greany-Hudson, and LPC Braceras are remarkably consistent in their evaluation of Dechamplain's mental state and ability to work from 2017 through the date of the ALJ's decision. From three different treatment perspectives, each of these sources reached consistent conclusions regarding the degree of Dechamplain's impairment, the extent to which he would be off-task, and the degree to which his impairments would result in chronic absenteeism from work. Given that consistency of opinions is one of the most important factors to assess in this medical opinion analysis, the ALJ's failure to adequately address these remarkably consistent

40

opinions requires a remand when all of the consistent treating opinions are rejected in favor of a non-treating, non-examining, outlier opinion.[6]

The ALJ's supportability analysis of these opinions was also flawed. On this score, the ALJ's conclusion that these opinions were not supported by the longitudinal medical record is based upon a vast mischaracterization of the plaintiff's overall treatment records. For example, the ALJ's characterization of the plaintiff's treatment as "conservative," and focus on a "lack of inpatient mental health treatment" understates the overall picture of the plaintiff's treatment which included at least three inpatient hospitalizations, a series of a dozen electroconvulsive therapy session which occurred the year prior, and at least four different psychiatric medications, one of which he took despite it causing tremors because he "did not mind the tremors as much as the control of his depression," (Tr. 329). While the plaintiff's hospitalizations and electroconvulsive therapy occurred just prior to the alleged onset date, the ALJ's failure to address these significant treatments which, in our view, are anything but conservative, paints an inaccurate picture of the plaintiff's ongoing mental health struggles. This is particularly true

---

[6] The Commissioner's argument that these treating and examining source opinions are not consistent in every way and thus the ALJ was not required to address their consistency misses the mark. Indeed, these opinions are consistent in the only way that matters: based upon the testimony of the vocational expert, they would have found the plaintiff disabled.

where the treatment records do not show the plaintiff's condition had improved after the alleged onset date but rather that "the patient failed medication and [electroconvulsive therapy] treatment" for depression, (tr. 322), that the ECT treatments had provided no benefit but had instead left him with confusion, difficulty focusing, and memory loss, (tr. 47, 54, 329-30), and that he still continued to struggle with variable mood, crying spells, and worsening depression throughout 2017, (tr. 357-58, 368, 440, 557, 560-61, 751), despite taking "multiple antidepressants." (Tr. 330).

Moreover, setting aside the ALJ's failure to address the extent of the plaintiff's mental health treatment, the ALJ's medical opinion evaluation ignores the fact that these medical opinions were supported in many instances by contemporary treatment records, which documented the precise degree of severe impairment described by the treating sources in their opinions. For example, Dr. Miller and consultative examiner Dr. Gipe both noted that the plaintiff experienced extreme fatigue, requiring a midday nap, difficulty concentrating, and crying spells. (Tr. 357, 368, 547, 559, 560-63).[7] CRNP Greany-Hudson reported that Dechamplain

---

[7] The ALJ's supportability analysis of the opinion of Dr. Miller was particularly flawed. Instead of considering the thorough and voluminous treatment notes of Dr. Miller, who treated the plaintiff for six years, the ALJ concluded that his opinion was "unsupported by his treatment notes which shows the claimant is about the same and the claimant helped his cousin's wife study." (Tr. 24). Thus, in finding this

42

struggled with focus and could get overwhelmed with too many activities, experienced irritability and crying, avoided people, had trouble concentrating and low motivation, and frequently reported passive suicidal thoughts. (Tr. 613, 614, 632, 635, 642, 792, 810, 826, 830, 893, 879). And treatment notes frequently acknowledged that the plaintiff's depression and anxiety interfered with his ability to meet the mental demands of the workplace. (Tr. 319, "Panic interferes with ongoing work;" Tr. 367, "I miss work some, but have had a breakdown whenever have tried to work;" Tr. 547, Explaining he quit his job in 2014 because of depression

---

opinion unsupported by the contemporaneous treatment notes, the ALJ clearly focused on a single treatment note which is completely irrelevant to Dr. Miller's opinion. This was error since:

> The ALJ need not make reference to every relevant note in the record, but the ALJ may not 'cherry-pick' results that support his conclusion and ignore those that do not." Stoltzfus v. Berryhill, No. CV 16-6308, 2019 WL 1981888, at *5 (E.D. Pa. May 1, 2019) (citing Rivera v. Astrue, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014)). And, in recognizing the cyclical nature of mental health impairments, courts have found, "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014).

Hoffman v. Bisignano, No. 4:24-CV-507, 2026 WL 711547, at *1 (M.D. Pa. Mar. 13, 2026).

43

and anxiety; Tr. 319, "If he volunteers more than 10 hours per week he is exhausted").

Simply put, these treating source opinions have significant indicia of consistency and supportability, factors that are the hallmarks of a persuasive opinion under the Commissioner's current regulations. Therefore, the ALJ erred in finding all of these opinions unpersuasive based upon an incomplete description of Dechamplain's treatment history. This error was compounded by the ALJ's adoption of a medical opinion which was both inconsistent with the treating source consensus that the plaintiff was unable to meet the on-task and attendance requirements of sustained work, and also internally inconsistent in that it concluded both that he had no limitations in understanding, remembering and moderate limitations in this arena, inconsistencies which went unaddressed by the ALJ.

Finally, these errors committed by the ALJ in the evaluation of the medical opinion evidence are not harmless where, at the hearing, a vocational expert testified that adopting the opinions of these treating and examining sources would render the plaintiff unemployable. Indeed, the vocational expert testified that if the plaintiff were unable to complete an eight-hour workday five days or more per month or could not perform on a sustained basis 50% of the time over a 12 month period he would be unemployable. (Tr. 61). The VE also testified that if he were incapable of

performing a routine, repetitive task on a sustained basis or was incapable of interacting appropriately with coworkers and supervisors on a sustained basis he would be unemployable. (Id.)

Given the significance of rejecting the treating and examining source consensus in this case, more is needed by way of explanation before an ALJ can reject the opinion of every behavioral health source that treated or examined the plaintiff. Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.   Conclusion

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: June 22, 2026

46